**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br>vs.<br><br>MICHAEL CLAYTON,<br><br>　　　　Defendant. | No. CR-13-3022-MWB<br><br>**MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION FOR JUDGMENT OF AQUITTAL AND NEW TRIAL** |

_____

**TABLE OF CONTENTS**

*I.   INTRODUCTION AND BACKGROUND ............................................... 2*
　*A.   Factual Background ................................................................ 2*
　*B.   Procedural Background .......................................................... 3*

*II.  LEGAL ANALYSIS ............................................................................ 4*
　*A.   Motion For Judgment Of Acquittal ....................................... 4*
　　*1.   Standards ......................................................................... 4*
　　*2.   Analysis ............................................................................ 6*
　*B.   Motion For New Trial .......................................................... 10*
　　*1.   Standards ....................................................................... 10*
　　*2.   Analysis .......................................................................... 11*

*III. CONCLUSION ................................................................................. 13*

## I. INTRODUCTION AND BACKGROUND

In resolving Michael Clayton's motion for judgment of acquittal, I must "view the evidence in the light most favorable to the guilty verdict, giving the [prosecution] the benefit of all reasonable inferences that may be drawn from the evidence." *United States v. Basile*, 109 F.3d 1304, 1310 (8th Cir. 1997). Thus, viewed in the light most favorable to the prosecution, the trial evidence established the following facts.

### A. Factual Background

On the evening of February 6, 2013, Christopher Anderson II drove, in his maroon Buick, from Omaha, Nebraska to Fort Dodge, Iowa, at Clayton's request. That night, Anderson stayed at Clayton's sister, Reneka's, house. On February 7, 2013, at approximately 8:45 a.m., Clayton had Anderson drive him to the Garden Village Apartments in Fort Dodge. The Garden Village Apartments are located just north of Citizens State Bank. Once at the apartment complex, Clayton got out of Anderson's Buick and, at 9:07 a.m., used Anderson's TracFone to make a threatening telephone call to the Feelhaver Elementary School in Fort Dodge, Iowa.[1] Clayton told a receptionist that he was angry and that he was going to come over and shoot up the school. Personnel at the school immediately contacted the police, who quickly responded.[2] While police were responding to the threat to the school, Clayton robbed the Citizens State Bank of

---

[1] In addition to the TracFone Clayton used, Anderson had another TracFone and a third cellular telephone with him. Anderson admitted that he purchased the disposable TracFone in order to hide his activities from law enforcement.

[2] The Feelhaver Elementary School is located on the opposite side of Fort Dodge from Citizens State Bank.

$11,284. A bank teller slipped in five $20 bait bills in the money given to Clayton.[3] During the robbery, Clayton concealed his identity by wearing a hoodie, mask, and glasses. He left the bank with a white plastic bag containing money taken during the robbery and returned to Anderson's Buick, telling Anderson: "Let's roll." Anderson drove Clayton to Omaha. During the drive, Clayton broke apart the TracFone he used to call the Feelhaver Elementary School. After Clayton disposed of the TracFone, he had Anderson stop at a gas station. There, Clayton threw away the white Nike shoes he was wearing. Clayton then used his own cellular telephone to call a friend and request that the friend go out and purchase a new pair of white Nike shoes for him. Once back in Omaha, Anderson drove Clayton to Ayeshia McDonald's house. McDonald was the girlfriend of Clayton's cousin and Anderson's friend, Terrell Newman. At McDonald's house, Clayton gave Anderson $1,000. Omaha police subsequently searched McDonald's house on February 18, 2013, and found $3,480, which included four $20 bait bills from Citizens State Bank.

### B. *Procedural Background*

In a Superseding Indictment returned on October 24, 2013, Clayton was charged with bank robbery, in violation of 18 U.S.C. § 2113(a). Trial commenced on February 10, 2014. On February 12, 2014, at the close of the prosecution's evidence, Clayton moved for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, which I denied as to the sufficiency of the evidence, but reserved ruling on Clayton's claim that the prosecution's witnesses had been so extensively coached by the police that it constituted a due process violation. On February 13, 2014, the jury returned a verdict

---

[3]Bait bills have been photographed and their serial numbers recorded. *See* Government Exhibit No. 16.

in which it found Clayton guilty of the charged offense. On February 21, 2014, Clayton requested, and I granted, an extension of time to file his post-trial motions until after the trial transcript was completed. On May 27, 2014, Clayton filed a motion for judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29(c), or, in the alternative, a motion for a new trial, pursuant to Federal Rule of Criminal Procedure 33 (docket no. 132). In his motion for judgment of acquittal, Clayton argues that the police's extensive coaching of the prosecution's witnesses constitutes a due process violation. He alternatively moves for a new trial on the ground that the jury's verdict was against the weight of the evidence.[4] The prosecution, after obtaining an extension of time, filed its response on June 11, 2014. Clayton did not file a reply.

## II. LEGAL ANALYSIS
### A. Motion For Judgment Of Acquittal
#### 1. Standards

Federal Rule of Criminal Procedure 29 governs Clayton's motion for judgment of acquittal. Rule 29(a) provides: "After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." FED. R. CRIM. P. 29(a). When the defendant moves for judgment of acquittal after the prosecution rests,

---

[4]Clayton's request for an evidentiary hearing is denied. Clayton fails to explain his need for an evidentiary hearing in his motion or brief. I have reviewed the exhibits submitted by Clayton, copies of police interviews, and conclude that an evidentiary hearing is unnecessary because Anderson and McDonald's police interviews were fully explored at trial and considered in my analysis here. Violet Phelps's statement does not affect my decision on Clayton's motions because she neither inculpates nor exculpates Clayton in her statement.

4

> [t]he court may reserve decision on the motion, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict.

FED. R. CRIM. P. 29(b). If the jury returns a guilty verdict, the defendant may renew a motion for a judgment of acquittal "within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." FED. R. CRIM. P. 29(c)(1). "If the court reserve[d] decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved." FED. R. CRIM. P. 29(b). Here, Clayton has renewed his motion for judgment of acquittal. Thus, I may consider the entire trial record in deciding whether to grant Clayton's motion. A judgment of acquittal is only appropriate if "the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "The standard for determining the sufficiency of the evidence is strict, and a guilty verdict should not be lightly overturned." *United States v. Jiminez-Perez*, 238 F.3d 970, 972-73 (8th Cir. 2001) (citing *United States v. Ryan*, 227 F.3d 1058, 1063 (8th Cir. 2000)); *see United States v. Peneaux*, 532 F.3d 882, 890 (8th Cir. 2005); *United States v. Stroh*, 176 F.3d 439, 440 (8th Cir. 1999). "Sufficient evidence exists to support a verdict if 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Jiminez-Perez*, 238 F.3d at 972 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Thus, I may grant a judgment of acquittal "only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." *United States v. Tate*, 633 F.3d 624, 628 (8th Cir. 2011) (quoting *United States v. Morales*, 445 F.3d 1081, 1084 (8th Cir. 2006)) (internal marks omitted). As I noted above, I must "'view the evidence in the light most favorable to the guilty verdict, granting all reasonable inferences that are supported

by that evidence.'" *Id.* (quoting *United States v. Milk*, 447 F.3d 593, 598 (8th Cir. 2006)).

### 2. *Analysis*

Clayton does not suggest that the prosecution suborned perjury. Clayton Br. at 6. Nor does Clayton allege that the prosecution failed to disclose exculpatory materials, but, instead, concedes that the prosecution disclosed exculpatory evidence in the form of police reports, audio recordings, and transcripts of police interviews with witnesses. Clayton Br. at 6. Rather, Clayton argues that his due process rights were violated by the police's coaching of two witnesses, Christopher Anderson and Ayeshia McDonald. Clayton does not cite any case law addressing the appropriate standards or tests to be applied to such a claim. The prosecution suggests that the framework for evaluating prosecutorial misconduct should be applied. I agree.

The Eighth Circuit Court of Appeals has formulated a two-part test for evaluating claims of prosecutorial misconduct: First, the prosecutor's conduct must, in fact, have been improper and (2) such conduct must have unfairly prejudiced the defendant's substantial rights so as to deprive the defendant of a fair trial. *See United States v. Spencer*, --- F.3d ---, 2014 WL 2109363, at *2 (8th Cir. May 21, 2014); *United States v. Wilkens*, 742 F.3d 354, 361 (8th Cir. 2014); *United States v. Burrage*, 687 F.3d 1015, 1022 (8th Cir. 2012); *United States v. Barrera*, 628 F.3d 1004, 1007 (8th Cir. 2011); *United States v. Crawford*, 523 F.3d 858, 861 (8th Cir. 2008); *United States v. Milk*, 447 F.3d 593, 602 (8th Cir. 2006); *United States v. King*, 36 F.3d 728, 733 (8th Cir. 1994); *United States v. Johnson*, 968 F.2d 768, 770 (8th Cir. 1992).

Clayton has not established either prong of this test. Although the police did bring up certain facts during their interviews with both Anderson and McDonald, this was not

done in an attempt to "spoon feed" facts to the witnesses.[5] Rather, the police confronted Anderson and McDonald with certain, limited, facts in order to convince the witnesses to abandon their efforts at minimization and deception and be truthful.

Clayton has also not established that he was unfairly prejudiced by the police's interview technique. The witnesses' statements were all memorialized in police reports, audio and/or video recordings, or transcripts of the interview, and copies were provided to Clayton. As a result, Anderson and McDonald's spotty recollections and inconsistent statements provided ample fodder by which Clayton's counsel vigorously impeached them. For example, Anderson's February 25, 2013, interview with Fort Dodge Police detectives was recorded and transcribed, and copies provided to Clayton during discovery. *See* Trial Tr. Vol, III at 412. Clayton's counsel cross-examined Anderson extensively about that interview and why Anderson had changed his account of events after that interview. *See* Trial Tr. Vol. II at 149-215. The following short exchange is representative of Anderson's cross-examination:

> Q. You did not say that during your first interview on February the 25th, did you?
>
> A. No, I told lots of lies on February 25. Everything I said on February 25 was more or less a fabrication. It was the first time I was contacted by the police, and I just covered my own ass and his ass.
>
> Q. So it's okay to lie to the police?
>
> A. Of course not.
>
> . . . .
>
> Q. You just testified a couple minutes ago that basically everything you said on February the 25th was a lie?

---

[5]Significantly, Anderson was the first person to bring up Clayton's name during his interview with the police on February 25, 2013. Trial Tr. Vol. III at 409-10.

> A. I didn't say everything, but a lot of it, yes. I mean it was just me playing games with them.

Trial Tr. Vol. II at 162-63. A few minutes later, the following colloquy occurred:

> Q. And the fifth time he asked you if you could remember your last trip to Fort Dodge, you said I have no clue. Do you recall that?
>
> A. Yeah. I was just evading him.
>
> Q. You were just evading it, did you say?
>
> A. I wasn't – I wasn't trying to get caught up on all the dates and all that at the time.
>
> Q. And finally he asks you specifically about February the 7th. And you said, "I have no f'ing clue, man." Do you recall that?
>
> A. Yeah.
>
> Q. And he specifically asked you during that interview if you had stayed overnight in Fort Dodge. And you said no. Do you recall that?
>
> A. I do recall that.
>
> Q. The first time that you admitted or claimed, I should say, that you stayed overnight in Fort Dodge was on your – during your interview on April the 16th in Sioux City?
>
> A. I couldn't say for certain, but – that sounds about right. It's hard for me to exactly know when I stopped lying about certain things and told the truth because I was trying to keep up my lies for a second there.
>
> Q. Well, it is hard, isn't it, to remember when you stopped lying?
>
> A. Yes, it is.

Trial Tr. Vol. II at 167-68.

Similarly, Clayton's counsel cross-examined McDonald extensively regarding inconsistencies within her multiple interviews with the police and inconsistencies between those statements and her trial testimony. Trial Tr. Vol. II at 312-17 and Trial Tr. Vol. III at 323-36. For instance, Clayton's counsel brought out on cross-examination McDonald's shifting accounts about the $3,800 found at her house. Specifically, that McDonald had told the police that it was her money that she planned to use to purchase a Mercedes-Benz, Trial Tr. Vol. II at 303; that the money had been in her house since December 2012, Trial Tr. Vol. II at 305; that the money was from a lawsuit settlement, Trial Tr. Vol. II at 306; and that Chris Anderson alone had dropped the money off to her. Trial Tr. Vol. II at 308. At one point during her cross-examination, McDonald admitted: "Once again, I said a lot of things, and I don't remember exactly what I said. So I don't know." Trial Tr. Vol. II at 308. McDonald also admitted that she was smoking one to two marijuana blunts (cigars in which the tobacco has been replaced with marijuana) a day during the events at issue. S*ee* Trial Tr. Vol. III at 336.

In his closing argument, Clayton's counsel specifically argued to the jury: "that reliance upon Christopher Anderson would not be reasonable", Trial Tr. Vol. IV at 445; that "the record in this case is replete with many inconsistent statements made on prior occasions made by Christopher Anderson and by Ayeshia McDonald, Trial Tr. Vol. IV at 448; that McDonald had been improperly coached by law enforcement, Trial Tr. Vol. IV at 462; and that there were "a lot of inconsistencies in her story. . . . ." Trial Tr. Vol. IV at 462. The jury was thus fully aware of Anderson and McDonald's prior inconsistent statements and was free to take them into account in assessing Anderson and McDonald's credibility. Accordingly, Clayton has not established that he was unfairly prejudiced by the police's interview technique and his motion for judgment of acquittal is denied.

### B. *Motion For New Trial*

#### 1. *Standards*

Federal Rule of Criminal Procedure 33 governs Clayton's motion for new trial. Rule 33(a) provides: "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). I have broad discretion in considering a motion for new trial. *See United States v. Garcia*, 569 F.3d 885, 889 ((8th Cir. 2009); *United States v. Peters*, 462 F.3d 953, 957 (8th Cir. 2006). I may "weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict." *United States v. Campos*, 306 F.3d 577, 579 (8th Cir. 2002) (quoting *White v. Pence*, 961 F.2d 776, 780 (8th Cir. 1992)) (internal quotation marks omitted); *see Garcia*, 569 F.3d at 889; *United States v. Starr*, 533 F.3d 985, 999 (8th Cir. 2008). However, district courts "must exercise the Rule 33 authority 'sparingly and with caution.'" *Campos*, 306 F.3d at 579 (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)). A district court "should grant a new trial only if 'the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred.'" *Peters*, 462 F.3d at 957 (quoting *United States v. Rodriguez*, 812 F.2d 414, 417 (8th Cir. 1987)). As the Eighth Circuit Court of Appeals has explained:

> When a motion for new trial is made on the ground that the verdict is contrary to the weight of the evidence, the issues are far different from those raised by a motion for judgment of acquittal. The question is not whether the defendant should be acquitted outright, but only whether he should have a new trial. The district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses. If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the

> verdict, grant a new trial, and submit the issues for determination by another jury.

*United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980); *see United States v. Johnson*, 474 F.3d 1044, 1050-51 (8th Cir. 2007) (repeating applicable standard of review).

### 2. *Analysis*

Clayton, alternatively, argues that I should grant a new trial because the verdict is contrary to the weight of the evidence. He contends that Anderson and McDonald's credibility is so weak, due to their inconsistent statements, that the jury's reliance on their testimony constitutes "a serious miscarriage of justice." Although I agree that Anderson and McDonald gave inconsistent statements to the police, their testimony at trial was sufficiently buttressed by corroborative evidence that the jury could reasonably rely upon it.

Anderson's testimony about traveling to Fort Dodge the night before the bank robbery is consistent with phone records and the mapping of Anderson's cellular telephone movement. Government Ex. 23-C.4. Anderson's arrival in Fort Dodge that night is documented by the Casey's surveillance video, Government Exs. 8-A and 8-B, and the parties' stipulation. Government Ex. 27. Anderson's testimony that Clayton used Anderson's TracFone to make a threatening telephone call to the Feelhaver Elementary School is supported by telephone records showing that Anderson's TracFone was used to make the call, Government Ex. 22-A.3, item number 32, and Clayton's cellular telephone was used at 8:52 a.m., shortly before the call to the school, and it used Verizon tower 361 in making the call. Verizon tower 361 is located at 2247 Second Avenue, Fort Dodge, Iowa, less than two and one-half miles from Citizens State Bank. Government Ex. 22-B and 2.2. Anderson's testimony about the direction that Clayton came from in returning to Anderson's Buick, following the bank robbery, is supported

11

by the bank video, as well as Staci Olson and Anthony Walter's testimony. Government Ex. 7-A, Trial Tr. Vol. I at 80-81, 109-10. Anderson's testimony about leaving Fort Dodge immediately following the bank robbery is documented by the bank surveillance video, Government Ex. 7-A, Officer Dennis Mernka's dashboard video, Government Ex. 10, as well as Staci Olson's testimony about seeing a maroon car coming out of the Garden Village Apartments. Trial Tr. Vol. 1 at 82. Anderson's testimony about driving from Fort Dodge to Omaha is supported by Clayton's telephone records. Government Exs. 22-B and 22-C.2. Likewise, Anderson's testimony about the destruction of his TracFone during the trip to Omaha is supported by Anderson's telephone records. Government Ex. 23-A.3, items 33, 34, and 35, and the testimony of AT&T employee Karl Pauling. Trial Tr. Vol. II at 260. Finally, Anderson's testimony about accompanying Clayton to McDonald's house upon arriving in Omaha is corroborated by McDonald's testimony, Trial Tr. Vol. II at 288, as well as the police's finding of the four bait bills in McDonald's house. Trial Tr. Vol. III at 346-47. Likewise, McDonald's trial testimony about receiving the money from Clayton and Anderson following the bank robbery is supported by Anderson's testimony, Trial Tr. Vol. II at 135, 188, as well as the bait bills being found in her home. Additionally, Clayton, Anderson, and McDonald's common connection to Terrell Newman is circumstantial evidence that lends credence to Anderson and McDonald's testimony. Newman is Clayton's cousin, Trial Tr. Vol. II at 133, Vol. III at 399, was associated with Anderson in running a restaurant and a drug distribution conspiracy, Trial Tr. Vol. II at 134, 138, and was romantically involved with McDonald. Trial Tr. Vol. II at 133, 297. Newman's preliminary examination was held on the day after the bank robbery, February 8, 2013. Newman's pending criminal charges at the time of the bank robbery support Anderson's statement that Clayton requested a ride to Omaha because "he had some type of information or something that would help" Newman. Trial Tr. Vol. II at 133. Newman's legal

difficulties also support Anderson's statement that money from the bank robbery was left at McDonald's to help pay Newman's attorney's fees.

Based on the evidence supporting the jury's verdicts, I cannot conclude "'that a serious miscarriage of justice may have occurred.'" *United States v. Malloy*, 614 F.3d 852, 862 (8th Cir. 2010) (quoting *Lincoln*, 630 F.2d at 1319). Thus, I deny Clayton's motion for new trial.

### III. CONCLUSION

For the reasons discussed above, Clayton's post-trial motions for judgment of acquittal and new trial are denied.

**IT IS SO ORDERED**.

**DATED** this 22nd day of July, 2014.

_____
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA